# United States District Court
# Eastern District of Wisconsin (Milwaukee)
# CIVIL DOCKET FOR CASE #: 2:15–cv–00142–JPS

| | |
|---|---|
| State of Wisconsin Local Government Property Insurance Fund v. Lexington Insurance Company et al | Date Filed: 02/03/2015 |
| Assigned to: Judge J P Stadtmueller | Jury Demand: Plaintiff |
| Demand: $14,000,000 | Nature of Suit: 110 Insurance |
| Cause: 28:1441 Petition for Removal– Declaratory Judgment | Jurisdiction: Diversity |

**Plaintiff**

| | | |
|---|---|---|
| **State of Wisconsin Local Government Property Insurance Fund** | represented by | **Patryk W Silver** <br> Borgelt Powell Peterson &Frauen SC <br> 735 N Water St – 15th Fl <br> Milwaukee, WI 53202–4188 <br> 608–258–1711 <br> Fax: 608–258–9424 <br> Email: psilver@borgelt.com <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |
| | | **Robert C Burrell** <br> Borgelt Powell Peterson &Frauen SC <br> 735 N Water St – 15th Fl <br> Milwaukee, WI 53202–4188 <br> 414–276–3600 <br> Fax: 414–276–0172 <br> Email: rburrell@borgelt.com <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **Lexington Insurance Company** | represented by | **David E Heiss** <br> Fisher Kanaris PC <br> 1 S Wacker Dr – 31st Fl <br> Chicago, IL 60606 <br> 312–474–1400 <br> Fax: 312–474–1410 <br> Email: dheiss@fisherkanaris.com <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |
| | | **Peter E Kanaris** <br> Fisher Kanaris PC <br> 200 S Wacker Dr – 22nd Fl <br> Chicago, IL 60606 |

312–474–1400
Fax: 312–474–1410
Email: PKANARIS@FISHERKANARIS.COM
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Monte E Weiss**
Weiss Law Office SC
1017 W Glen Oaks Ln – Ste 207
Mequon, WI 53092
262–240–9663
Fax: 292–240–9664
Email: monte.weiss@mweisslaw.net
*ATTORNEY TO BE NOTICED*

**Jefferson D Patten**
Fisher Kanaris PC
200 S Wacker Dr – 22nd Fl
Chicago, IL 60606
312–474–1400
Fax: 312–474–1410
Email: jpatten@fisherkanaris.com
*ATTORNEY TO BE NOTICED*

**Defendant**

| **The Cincinnati Insurance Company** | represented by | **John D Kendzior** |

Clausen Miller PC
10 S LaSalle St – Ste 1800
Chicago, IL 60603–1098
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott R Shinkan**
Clausen Miller PC
10 S LaSalle St – Ste 1800
Chicago, IL 60603–1098
312–855–1010
Fax: 312–606–7777
Email: sshinkan@clausen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James M Hoey**
Clausen Miller PC
10 S LaSalle St – Ste 1800
Chicago, IL 60603–1098
312–855–1010
Fax: 312–606–7777
Email: jhoey@clausen.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Milwaukee County**                    represented by  **Paul Bargren**
Milwaukee County Corporation Counsel
901 N 9th St – Rm 303
Milwaukee, WI 53233–1425
Email: Paul.Bargren@Milwaukeecountywi.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|------------|---|------|-------------|
| 02/04/2015 | 1 | | NOTICE OF REMOVAL by Lexington Insurance Company from Circuit Court of Milwaukee County, Wisconsin, Case Number: 14–CV–010361 with attached state court documents. (Filing Fee PAID $400 receipt number 0757–2041908) (Attachments: # 1 Removal Notice, # 2 Exhibit)(Patten, Jefferson) (Additional attachment(s) added on 2/4/2015: # 3 Civil Cover Sheet) (jcl). |
| 02/04/2015 | | | NOTICE Regarding assignment of this matter to Magistrate Judge William E Callahan, Jr ;Consent/refusal forms for Magistrate Judge Callahan to be filed within 21 days;the consent/refusal form is available on our web site ;pursuant to Civil Local Rule 7.1 a disclosure statement is to be filed upon the first filing of any paper and should be filed now if not already filed (jcl) |
| 02/04/2015 | | | Case Opening Modification(s); The following modification(s) have been made to your case entry: The cause of action chosen has been modified. The county code has been modified – please remember to choose the county for the first named plaintiff. The jury demand has been modified – please remember to verify that a jury demand is included in the initiating document. ; Please refer to the attorney case opening instructions, the summons instructions and the party name guidelines found in the user manual for further guidance (kah) |
| 02/04/2015 | 2 | | NOTICE of Appearance by Jefferson D Patten on behalf of Lexington Insurance Company. Attorney(s) appearing: Jefferson D. Patten (Patten, Jefferson) |
| 02/04/2015 | 3 | | NOTICE of Appearance by Peter E Kanaris on behalf of Lexington Insurance Company. Attorney(s) appearing: Peter E. Kanaris (Kanaris, Peter) |
| 02/06/2015 | 4 | | Refusal to Jurisdiction by US Magistrate Judge by Lexington Insurance Company. (Patten, Jefferson) |
| 02/06/2015 | 5 | | DISCLOSURE Statement by Lexington Insurance Company. (Patten, Jefferson) |
| 02/06/2015 | | | Case Reassigned to Judge J P Stadtmueller. Magistrate Judge William E Callahan, Jr no longer assigned to the case due to non–consent. (kah) |
| 02/09/2015 | 6 | | NOTICE of Appearance by Paul Bargren on behalf of Milwaukee County. Attorney(s) appearing: Paul Bargren (Attachments: # 1 Certificate of Service)(Bargren, Paul) |
| 02/10/2015 | 7 | | NOTICE of Appearance by Monte E Weiss on behalf of Lexington Insurance Company. Attorney(s) appearing: Monte E. Weiss (Weiss, Monte) |
| 02/11/2015 | 8 | | Unopposed MOTION for Extension of Time to File Answer *or otherwise respond to complaint* by Lexington Insurance Company. (Patten, Jefferson) |

| 02/13/2015 | 9 | | NOTICE of Appearance by James M Hoey on behalf of The Cincinnati Insurance Company. Attorney(s) appearing: James M. Hoey (Hoey, James) |
|---|---|---|---|
| 02/13/2015 | 10 | | ANSWER to Complaint with Jury Demand by The Cincinnati Insurance Company.(Hoey, James) |
| 02/13/2015 | 11 | | DISCLOSURE Statement by The Cincinnati Insurance Company. (Hoey, James) |
| 02/13/2015 | | | TEXT ONLY ORDER signed by Judge J P Stadtmueller on 2/13/15 granting 8 Defendant Lexington Insurance Company's Unopposed Motion for Extension of Time to 2/18/15 to File Answer or otherwise respond to complaint. (cc: all counsel)(nm) |
| 02/17/2015 | | | NOTICE of Electronic Filing Error re 10 Answer to Complaint filed by The Cincinnati Insurance Company ; All documents should contain the s/signature of the attorney who files the document. This document does not need to be re−filed; Please refer to the policies and procedures for electronic case filing and the user manual found at www.wied.uscourts.gov (asc) |
| 02/18/2015 | 12 | | MOTION to Compel *arbitration and stay judicial proceedings* by Lexington Insurance Company. (Patten, Jefferson) |
| 02/18/2015 | 13 | | BRIEF in Support filed by Lexington Insurance Company re 12 MOTION to Compel *arbitration and stay judicial proceedings* . (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Patten, Jefferson) |
| 02/18/2015 | 14 | | MOTION to Remand to State Court by State of Wisconsin Local Government Property Insurance Fund. (Silver, Patryk) |
| 02/18/2015 | 15 | | BRIEF in Support filed by State of Wisconsin Local Government Property Insurance Fund re 14 MOTION to Remand to State Court . (Silver, Patryk) |
| 02/18/2015 | 16 | | AFFIDAVIT of Patryk Silver *in Support of Motion for Remand*. (Attachments: # 1 Exhibit Affidavit of Service on Cincinnati Insurance Company, # 2 Exhibit Affidavit of Service on Lexington Insurance Company)(Silver, Patryk) |
| 02/24/2015 | 17 | | DISCLOSURE Statement by State of Wisconsin Local Government Property Insurance Fund. (Silver, Patryk) |
| 03/10/2015 | 18 | | RESPONSE to Motion filed by The Cincinnati Insurance Company re 14 MOTION to Remand to State Court . (Attachments: # 1 Exhibit A)(Hoey, James) |
| 03/10/2015 | 19 | | RESPONSE to Motion filed by The Cincinnati Insurance Company re 12 MOTION to Compel *arbitration and stay judicial proceedings* . (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Hoey, James) |
| 03/10/2015 | 20 | | NOTICE of Appearance by Scott R Shinkan on behalf of The Cincinnati Insurance Company. Attorney(s) appearing: Scott R. Shinkan (Shinkan, Scott) |
| 03/10/2015 | 21 | | RESPONSE to Motion filed by Lexington Insurance Company re 14 MOTION to Remand to State Court . (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Patten, Jefferson) |
| 03/10/2015 | 22 | | BRIEF in Opposition filed by State of Wisconsin Local Government Property Insurance Fund re 12 MOTION to Compel *arbitration and stay judicial* |

| | | | |
|---|---|---|---|
| | | | *proceedings* . (Silver, Patryk) |
| 03/10/2015 | 23 | | AFFIDAVIT of Brynn Bruijn–Hansen . (Silver, Patryk) |
| 03/24/2015 | 24 | | REPLY BRIEF in Support filed by Lexington Insurance Company re 12 MOTION to Compel *arbitration and stay judicial proceedings* . (Attachments: # 1 Exhibit)(Patten, Jefferson) |
| 03/24/2015 | 25 | | LETTER from Attorney Silver *withdrawing Motion for Remand (Doc. 14)*. (Silver, Patryk) |
| 03/25/2015 | 26 | | LETTER from Attorney Silver *regarding Doc. 12, 13, and 24*. (Silver, Patryk) |
| 04/17/2015 | 27 | 8 | ORDER signed by Judge J P Stadtmueller on 4/17/15 denying 12 Lexington Insurance Company's Motion to Compel Arbitration and Stay Judicial Proceedings. See Order. (cc: all counsel) (nm) |
| 04/17/2015 | 28 | | NOTICE of Hearing: Rule 16 Scheduling Conference set for 5/14/15 at 10:30 AM in Courtroom 425, 517 E Wisconsin Ave., Milwaukee, WI 53202 before Judge J P Stadtmueller; counsel for the parties are directed to file a joint Rule 26 plan on or before 5/12/15. (cc: all counsel)(nm) |
| 04/24/2015 | 29 | | LETTER from Attorney Patryk Silver *re. Doc. 28, requesting appearance by telephone at 05/14/2015 Rule 16 Scheduling Conference*. (Silver, Patryk) |
| 04/27/2015 | 30 | | LETTER from Paul Bargren *regarding Rule 16 Scheduling Conference*. (Attachments: # 1 Certificate of Service)(Bargren, Paul) |
| 04/28/2015 | 31 | | LETTER from Attorney James M. Hoey re: Doc. 28 requesting appearance by telephone at 5/14/2015 Rule 16 Scheduling Conference . (Hoey, James) |
| 05/04/2015 | 32 | 6 | NOTICE OF APPEAL as to 27 Order on Motion to Compel by Lexington Insurance Company. Filing Fee PAID $505, receipt number 0757–2096900 (cc: all counsel) (Kanaris, Peter) |
| 05/05/2015 | 33 | | Attorney Cover Letter re: 32 Notice of Appeal (jv) (Additional attachment(s) added on 5/5/2015: # 1 Docket Sheet) (jv). |

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

STATE OF WISCONSIN LOCAL     )
GOVERNMENT PROPERTY      )
INSURANCE FUND,          )
                          )
         Plaintiff,     )
                          )
     v.             )     No.    2:15-cv-00142-JPS
                          )
LEXINGTON INSURANCE COMPANY,  )
ET AL,                 )
           Defendants.   )

## NOTICE OF APPEAL

Notice is hereby given that, Lexington Insurance Company in the above named case, hereby appeals to the United States Court of Appeals for the Seventh Circuit from the April 17, 2015 Order of the District Court (ECF #27) denying Lexington Insurance Company's Motion to Compel Arbitration and to Stay the Judicial Proceedings Until Arbitration is Completed (ECF #12). Jurisdiction for this appeal is conferred upon the United States Court of Appeals for the Seventh Circuit pursuant to Section 16 of the Federal Arbitration Act, which grants Lexington a right to immediate appeal of any order denying an application to compel arbitration, denying a petition to order arbitration to proceed, or refusing a stay of any action until the completion of arbitration. 9 U.S.C. §16(a)(1).

Respectfully submitted,

LEXINGTON INSURANCE COMPANY

By:    s/Peter E. Kanaris                 
        One of Its Attorneys

Peter E. Kanaris

David E. Heiss
Jefferson D. Patten
FISHER KANARIS, P.C.
One South Wacker Drive, Suite 3100
Chicago, Illinois 60606
312.474.1400
312.474.1410 (fax)
pkanaris@fisherkanaris.com
dheiss@fisherkanaris.com
jpatten@fisherkanaris.com

Monte E. Weiss
WEISS LAW OFFICE, S.C.
1017 W. Glen Oaks Lane, Suite 207
Mequon, Wisconsin 53092
262.240.9663
262.240.9664 (fax)
mweiss@mweisslaw.net
Attorneys for Lexington Insurance Company

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| STATE OF WISCONSIN LOCAL GOVERNMENT PROPERTY INSURANCE FUND, <br><br>            Plaintiff, <br><br> v. <br><br> LEXINGTON INSURANCE COMPANY, THE CINCINNATI INSURANCE COMPANY, and MILWAUKEE COUNTY, <br><br>            Defendants. | Case No. 15-CV-142-JPS <br><br><br><br> ORDER |

This case involves an insurance dispute arising from a 2013 fire at the Milwaukee County Courthouse ("the Courthouse"). (Docket #1, Ex. 2 ¶ 37). The plaintiff, State of Wisconsin Local Government Property Insurance Fund ("the Fund"), insures the Courthouse pursuant to its statutory obligations under Chapters 604 and 605 of the Wisconsin Statutes. (*Id.* ¶¶ 15–18). The Fund, in turn, engaged one of the defendant insurers, Lexington Insurance Company ("Lexington"), as its excess insurer or reinsurer (the parties disagree). (*Id.* ¶¶ 7–10). Meanwhile, Milwaukee County ("the County")[1] obtained a separate insurance policy from the remaining defendant insurer, The Cincinnati Insurance Company ("Cincinnati"), to cover machinery and equipment that might otherwise be excluded from the County's policy from the Fund. (*Id.* ¶¶ 11–13, 21–27).

As the Court will discuss further, the Fund paid all but a small portion of the County's claimed losses. (*Id.* ¶ 42). The Fund and Cincinnati disagree over which should pay the County for the small portion that remains. (*Id.*

---

[1] The County is named as a defendant in this case, but has taken no position as to the motion to compel arbitration now before the Court.

¶ 64). Pursuant to Joint Loss Agreements that exist in the County's policies with the Fund and Cincinnati (and which are integral to the motion to compel now before the Court), the Fund and Cincinnati are going to arbitrate their disagreement. (*Id.* ¶¶ 65–66, 69).

Lexington has now filed a motion seeking to compel the Fund and Cincinnati to allow Lexington to participate in that arbitration. (Docket #12). Lexington has paid the Fund a large amount (*id.* ¶ 48), but there are still substantial disputes between the two about Lexington's obligations (*id.*, ¶¶ 49–61). The Fund hopes to resolve those disputes by litigating this case, whereas Lexington, it seems, hopes to resolve the disputes in arbitration.

Lexington's motion to compel arbitration is now fully briefed and ready for decision. (Docket #13, #19, #22, #24). The Court first provides some additional background, after which it analyzes and applies the law.

1.      BACKGROUND[2]

In July of 2013, the Courthouse was severely damaged as a result of a fire that is believed to have originated in the building's electrical system. (Docket #1, Ex. 2 ¶ 37).

At that point, the County held two separate insurance policies covering the Courthouse. (*See id.* ¶¶ 11–13, 15–18, 21–27). The primary policy ("the Fund policy") was issued by the Fund. (Docket #13, Ex. 1). However, the Fund policy specifically excluded, among other things, certain forms of

---

[2]The parties largely agree as to the facts that underlie the motion to compel arbitration. With this background section, the Court hopes to provide enough detail for the reader to understand the dispute between the parties. The Court, therefore, cites to the Complaint (Docket #1, Ex. 2) for the underlying facts and to the submitted insurance policies (Docket #13, Exs. 1–3) and other related documents for information regarding the formation and terms of the policies.

"[e]lectrical or mechanical breakdown." (*Id.* at 17).[3] The County supplemented the Fund policy with a machinery and equipment policy issued by Cincinnati ("the Cincinnati policy"). (Docket #13, Ex. 3). The County is listed as the insured on both policies. (*See, e.g.*, Docket #13, Ex. 1 at 2; Docket #13, Ex. 3 at 4).

Importantly, both policies include a Joint Loss Agreement ("JLA"). (Docket #13, Ex. 1 at 24; Docket #13, Ex. 3 at 17).[4] In essence, the JLAs provide that, in the event of a dispute over which insurer should bear the costs of certain damage, the insurers are each required to pay one-half of the disputed amount and thereafter submit their dispute to arbitration. (Docket #13, Ex. 1 at 24; Docket #13, Ex. 3 at 17). The purpose of a JLA is to make the insured—in this case, the County—whole as quickly as possible, allowing the insurers to resolve their dispute over time.

In this case, the County took advantage of both policies and the JLAs. First, it filed a claim with the Fund. (Docket #1, Ex. 2 ¶ 38; Docket #23 ¶ 4). The Fund paid approximately $17.4 million in satisfaction of a huge portion of the County's claim. (Docket #1, Ex. 2 ¶¶ 42–43; Docket #23 ¶ 4). After the Fund's payments, only $1.6 million remained to make the County whole, but there was disagreement over whether the Fund or Cincinnati should be responsible for that remaining amount. (*See* Docket #23 ¶ 5). Thus, the County sent letters to both the Fund and Cincinnati, invoking the JLA.

---

[3]The insurance policies are all attached as exhibits to Docket Entry No. 13. Each exhibit includes multiple documents that compose the entirety of the parties' agreement. Rather than citing to the internal pages of the documents included in the exhibits, the Court will instead cite to the page number of the exhibit, itself. So, in this instance, the Court cites to Page 17 of Exhibit 1, rather than to Page 7 of 13 of the "Valuation Policy Provisions" document included in Exhibit 1.

[4]It is called the Joint or Disputed Loss Agreement in the Cincinnati policy.

(Docket #19, Exs. A, B). In reliance on the JLA, both the Fund and Cincinnati paid $800,000 apiece (one-half of the $1.6 million in dispute) to the County,[5] and now plan to arbitrate their dispute. (*See, e.g.*, Docket #1, Ex. 2, ¶¶ 42, 69; Docket #23 ¶ 5).

The remaining piece of this puzzle is the insurance policy issued by Lexington to the Fund ("the Lexington policy"). (Docket #13, Ex. 2). According to Lexington, this policy constituted an excess coverage policy,[6] providing coverage for per-occurrence losses that exceed $1.8 million. (Docket #13 at 3). Unlike the Fund and Cincinnati policies, the Lexington policy names the Fund—*not* the County—as the insured. (Docket #13, Ex. 2 at 2). Also unlike the Fund and Cincinnati policies, the Lexington policy does not expressly include a JLA (although, as the Court will explain, Lexington argues that its policy incorporated the JLA from the Fund policy). (*See* Docket #13, Ex. 2).

The Fund filed a claim with Lexington, seeking payment reimbursement for amounts paid to the County. (Docket #1, Ex. 2 ¶ 47). Lexington has paid $5 million of the Fund's claim, but disagreements remain between Lexington and the Fund over whether Lexington must pay more. (*See, e.g.*, Docket #1, Ex. 2 ¶¶ 48–62).

This case is the Fund's effort to put that dispute to rest; Lexington, on the other hand, seeks to stay this case and compel the Fund and Cincinnati to allow Lexington to participate in arbitration. (Docket #12). Presumably, Lexington would argue that Cincinnati should be responsible for a greater

[5]Thus, at this point, the County has been made whole.

[6]The Fund and Cincinatti disagree, calling the Lexington policy a reinsurance policy. The Court will address this disagreement further in the analysis section of this order.

portion of the loss, thus requiring the Fund and, in turn, Lexington to reimburse a smaller amount.[7] (*See* Docket #24 at 2 ("all parties with a contract containing the arbitration provision can participate in the arbitration to determine the full amount of the disputed loss covered under Cincinnati's boiler and machinery insurance policy.")).

Lexington argues that its policy incorporated the JLA from the Fund policy. (*See, e.g.*, Docket #13). Endorsement A to the Lexington policy states: "Policy follows form and is excess over the [Fund policy] and endorsements." (Docket #13, Ex. 2 at 32). According to Lexington, this provision essentially imports the terms of the entire Fund policy—most importantly the JLA—into the Lexington policy. (Docket #13). And, on the basis of the JLA imported from the fund policy, Lexington now seeks to compel arbitration.[8] (*Id.*)

2.      ANALYSIS

This dispute gives rise to two overarching issues. The first is whether the Court should read the Fund policy's JLA as part of the Lexington policy. The second, assuming that the JLA is part of the Lexington policy, is whether the JLA compels Lexington's participation in arbitration.

2.1      Does the Lexington Policy Include the JLA?

As to the first issue, it appears that the JLA is part of the Lexington policy by virtue of the follow-form endorsement.

"'Following form' is an insurance industry term of art that is typically understood by insurance professionals to suggest that an excess or umbrella

---

[7] Lexington's briefs in this regard are generally vague.

[8] Lexington has not identified—and the Court cannot find—any express arbitration clause in the Lexington policy. (*See* Docket #13, Ex. 2). Thus, it appears that the JLA is Lexington's only hope for compelling arbitration to avoid this trial.

Case 2:15-cv-00142-JPS   Filed 05/05/15   Page 12 of 25   Document 34

policy incorporates the terms of another underlying policy." *Wadzinski v. Auto-Owners Ins. Co.*, 2012 WI 75, ¶ 29, 342 Wis. 2d 311, 818 N.W.2d 819 (citing 23 Eric Mills Holmes, *Holmes' Appleman on Insurance* § 145.1 (2d ed. interim vol. 2003)).[9] Typically, follow-form policies are extremely short, doing little more than incorporating the terms of an underlying policy "to ensure that the same terms of coverage are maintained between primary and excess levels of insurance." *Wadzinski*, 2012 WI 75, ¶ 29 (citing *Johnson Controls, Inc. v. London Mkt.*, 2010 WI 52, ¶ 34 & n.7, 325 Wis.2d 176, 784 N.W.2d 579, *reconsid. denied*, 2011 WI 1, 330 Wis.2d 443, 793 N.W.2d 71; *Holmes' Appleman* § 145.1; 15 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 220:32 n.31 (3d ed.2005 & Supp.2011)).

Nonetheless, follow-form policies "regularly include terms and provisions that afford distinct coverage or exclusions from those provided in the underlying policy." *Wadzinski*, 2012 WI 75, ¶ 29 (citing *Holmes' Appleman* § 145.1). In the case that a follow-form policy has terms that provide for coverage or exclusions that differ from those in the underlying policy, the terms of the underlying policy will control in the event that the follow-form policy's terms do not apply or are not specific. *See Johnson Controls*, 2010 WI 52, ¶ 40. For instance, in Johnson Controls, the Wisconsin Supreme Court found that the terms of an underlying policy applied in the absence of express controlling terms in a follow-form policy. *Id.*

---

[9]The parties have not addressed the issue of choice of law, but seem to agree that Wisconsin law applies. The Court can find no basis to apply another state's law. Thus, because it is sitting in diversity, the Court will apply Wisconsin law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

Although London Market's insuring agreement does not promise a defense, the follow form provision incorporates the terms, definitions, exclusions, and conditions of the Travelers policies. One of those terms is Travelers' duty to defend, a duty that the London Market policy does not disclaim.

*Id.*

Thus, in this case, it appears that the Lexington policy's follow-form endorsement effectively imported the Fund policy's JLA into the Lexington policy. The parties do not appear to disagree as to the meaning of the endorsement, and the language of the endorsement is clear enough: it states that the Lexington policy follows the form of the underlying Fund policy.

Calling the Lexington policy a follow-form policy is, perhaps, a little strange in light of the Lexington policy's detail. The Lexington policy totals 31 pages, including 10 endorsements, a two-page statement of "Standard Property Conditions," and a 13-page statement of "Valuation Policy Provisions." (Docket #13, Ex. 2 at 2–32). It certainly is not short. *See Wadzinski*, 2012 WI 75, ¶ 29 ("[f]ollowing form policies are typically very short") (citations omitted). Moreover, given the many details offered in those 31 pages, the Lexington policy likely departs from the underlying Fund policy in many ways, defeating the purpose of being a follow-form policy. *Wadzinski*, 2012 WI 75, ¶ 29 (noting that the general purpose of follow-form policies is to "ensure that the same terms of coverage are maintained between primary and excess levels of insurance") (citations omitted).

But neither the strange nature of the policy nor anything in the Lexington policy, itself, requires the Court to read the follow-form endorsement in any way other than by its plain terms. And, again, those plain terms make it clear: the Lexington policy follows the form of the

underlying Fund policy. Therefore, the Lexington policy incorporates the JLA.

Furthermore, nothing in the Lexington policy supersedes or expressly proscribes application of the JLA. Just as was the case in *Johnson Controls*, 2010 WI 52, ¶ 40, the Lexington policy "does not disclaim" the JLA, so the JLA should apply.

Finally, the fact that the important provision of the JLA is an arbitration requirement makes no difference to the outcome. *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 589 (7th Cir. 2001). In *Sphere Drake*, the Seventh Circuit determined that a follow-form policy included the arbitration clause of an underlying policy, because the follow-form policy did not expressly exclude application of the clause. *Id.*

> Here, as in *Progressive Casualty Insurance Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42 (2d Cir.1993), a follow-form reinsurance agreement logically includes an arbitration agreement in the underlying contract. This understanding could be overridden, but this slip policy's "Exclusions" section does not displace the arbitration clause.

*Sphere Drake*, 256 F.3d at 589. Precisely the same can be said of the Lexington policy, here: nothing in it displaces the arbitration clause of the JLA, and so the Lexington policy logically includes that clause.

### 2.2 Does the JLA Require Lexington's Participation in the Other Parties' Arbitration?

So, the Lexington policy incorporates the JLA, but does that make any substantive difference? Is Lexington correct that the JLA calls for Lexington's participation in the arbitration planned between the Fund and Cincinnati?

#### 2.2.1 Legal Principles Governing Interpretation of JLA

In interpreting the JLA, the Court must give the JLA's terms "their plain or ordinary meaning.'" *Betz v. Diamond Jim's Auto Sales*, 2014 WI 66,

¶ 39, 355 Wis. 2d 301, 849 N.W.2d 292 (quoting *Huml v. Vlazny*, 2006 WI 87, ¶ 52, 293 Wis. 2d 169, 716 N.W.2d 807). So long as the terms of the JLA "'are clear and unambiguous,'" the Court must construe the JLA "'according to its literal terms,' and consistent with 'what a reasonable person would understand the words to mean under the circumstances.'" *Fabco Equip., Inc. v. Kreilkamp Trucking, Inc.*, 2013 WI App 141, ¶ 6, 352 Wis. 2d 106, 841 N.W.2d 542 (quoting *Tufail v. Midwest Hospitality, LLC*, 2013 WI 62, ¶¶ 26, 28, 348 Wis. 2d 631, 833 N.W.2d 586). In the context of "a business contract," a reasonable person's understanding means "'the manner that [the contract] would be understood by persons in the business to which the contract relates.'" *Tufail*, 2013 WI 62, ¶ 28 (quoting *Columbia Propane, L.P. v. Wisconsin Gas Co.*, 2003 WI 38, ¶ 12, 261 Wis. 2d 70, 661 N.W.2d 776. If the Court determines that the JLA language gives rise to a single "clear and unambiguous meaning," then the Court must apply the JLA as written. *MS Real Estate Holdings, LLC v. Donald P. Fox Family Trust*, 2014 WI App 84 ¶ 8, 356 Wis. 2d 307, 853 N.W.2d 627 (citing *Nature Conservancy of Wis., Inc. v. Altnau*, 2008 WI App 115, ¶ 6, 313 Wis. 2d 382, 756 N.W.2d 641). Absent any ambiguity, the construction of the JLA is a matter of law. *MS Real Estate*, 2014 WI App 84, ¶ 8 (citing *Levy v. Levy*, 130 Wis. 2d 523, 528, 388 N.W.2d 170 (1986)). "[T]he cornerstone of contract construction is to ascertain the true intentions of the parties as expressed by contractual language." *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 155 Wis. 2d 704, 711, 456 N.W.2d 359 (1990).

There is generally a strong presumption in favor of interpreting arbitration clauses to require arbitration. *See, e.g., Cirilli v. Country Ins. & Fin. Servs.*, 2009 WI App 167, ¶ 14, 322 Wis. 2d 238, 250, 776 N.W.2d 272, 277-78 (citing *Kimberly Area Sch. Dist. v. Zdanovec*, 222 Wis. 2d 27, 39, 586 N.W.2d 41

(Wis. Ct. App. 1998); *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)). "[I]t has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT & T*, 475 U.S. at 650 (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582-583 (1960); citing *Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 377-378 (1974)). "When a court is called upon to ascertain the arbitrability of a dispute, the court's function is limited to a determination of whether: (1) there is a construction of the arbitration clause that would cover the grievance on its face and (2) whether any other provision of the contract specifically excludes it." *Cirilli*, 2009 WI App167, ¶ 14 (citing *Joint School Dist. No. 10, City of Jefferson v. Jefferson Ed. Ass'n*, 78 Wis. 2d 94, 111, 253 N.W.2d 536 (1977); *Kimberly*, 222 Wis.2d at 38, 586 N.W.2d 41).

While this case law leaves little doubt that there is a strong presumption in favor of requiring arbitration, Lexington takes that presumption to its extreme. In its briefs, Lexington has largely avoided providing any clear statement of how the JLA actually applies to require Lexington's participation in arbitration in this case. Instead, Lexington's position seems to be that: (1) the JLA is part of the Lexington policy; (2) the Court presumes that arbitration is required; and (3) *ipso facto*, arbitration must be required in this case. (*See* Docket #13 at 7–10 (focusing much more closely on presumption in favor of arbitration than terms of JLA); Docket #24 at 2–5 (offering limited analysis of the terms of the JLA and how the JLA applies)). Perhaps that is an oversimplification, but the Court struggles to

find any clear statement from Lexington that addresses the first question identified in *Cirilli*: whether "there is a construction of the arbitration clause that would cover the grievance on its face." 2009 WI App 167, ¶ 14.

### 2.2.2   Full Terms of JLA

That question requires a close analysis of the full terms of the JLA. The JLA provides in full:

> In the event of damage to or destruction of property, at a location designated in this policy and also designated in a Boiler and Machinery Insurance Policy(ies) and there is a disagreement between the insurers with respect to:
>
> (1)   Whether such damage or destruction was caused by a peril insured against by this policy or by a peril insured against by such Boiler and Machinery Insurance Policy(ies) or
>
> (2)   The extent of participation of this policy and of such Boiler and Machinery Insurance Policy(ies) in a loss of which is insured against, partially or wholly, by any or all of said policies.
>
> This company shall, upon written request of the insured, pay to the insured one-half of the amount of the loss which is in disagreement, but in no event more than this company would have paid if there had been Boiler and Machinery Insurance Policy(ies) in effect, subject to the following conditions:
>
> (1)   The amount of loss which is in disagreement, after making provisions for any undisputed claims payable under the said policies and after the amount of the loss is agreed upon by the insured and the insurers, is limited to the minimum amount remaining payable under either the Boiler and Machinery or Fire Policy(ies);
>
> (2)   The Boiler and Machinery insurer(s) shall simultaneously pay to the insured one-half of said amount which is in disagreement;

Case 2:15-cv-00142-JPS   Document 25   Filed 06/05/15   Page 11 of 18

(3)     The payments by the insurers hereunder and acceptance of the same by the insured signify the agreement of the insurers to submit to and proceed with arbitration within 90 days of such payments; the arbitrators shall be three in number, one shall be appointed by the Boiler and Machinery insurer, one shall be appointed by the Fund, and the third appointed by consent of the other two. The decision by the arbitrators shall be binding on the insurers and that judgment upon such award may be entered in any court of competent jurisdiction;

(4)     The insured agrees to cooperate in connection with such arbitration but not to intervene therein;

(5)     The provisions of this endorsement shall not apply unless such other policy(ies) issued by the Boiler and Machinery insurance company(ies) is similarly endorsed; and

(6)     Acceptance by the insured of some payment pursuant to the provisions of this endorsement, including an arbitration award, shall not operate to alter, waive, surrender or in any way affect the rights of the insured against any of the insurers.

(Docket #13, Ex. 1 at 24).[10]

### 2.2.3   Interpretation of JLA

Summarizing the plain terms of the JLA, the JLA operates when two preconditions are present:

(1)     there has been damage to property at a location covered by both "this policy"—which, depending on interpretation, may refer to either the Fund policy or the Lexington policy—and the Cincinnati policy; *and*

---

[10]In its briefs, Lexington often refers to both JLAs. At one point, Lexington states "[i]mportant to this motion, the Cincinnati Policy also contained a joint loss provision." (Docket #13 at 4). But there is no indication that the Cincinnati policy's JLA should play any role in the question of whether Lexington is entitled to participate in the arbitration.

Case 2:15-cv-00142-JPS   Filed 06/05/15   Filed 04/17/15   Page 12 of 18

        (2)     the "insurers" disagree over either:

               (a)     whether the Fund policy or the Cincinnati policy covers the damage; *or*

               (b)     the extent of participation of the Fund and Cincinnati policies.

(*Id.*).

In the event that those preconditions are present, two secondary conditions must follow. First, "[t]his company"—which, depending on interpretation, may mean either the Fund or Lexington—and Cincinnati must each pay half of the "amount of the loss which is in disagreement," upon request of the County. (*Id.*) The "amount of loss which is in disagreement" cannot exceed "the minimum amount remaining payable under either the" Cincinnati policy or a fire policy, after provisions have been made for undisputed claims and the parties have agreed on the disputed amount. (*Id.*) Second, the payments by "the insurers" signify their agreement to be bound by an arbitration. (*Id.*) That arbitration must be held within 90 days of payment. (*Id.*) The Fund selects one arbitrator, Cincinnati selects a second, and those two arbitrators select a third. (*Id.*) The decision of the three arbitrators is "binding on the insurers." (*Id.*)

Three additional provisions govern the arbitration. First, the County is required to cooperate in the arbitration, but may not intervene in it.[11] (*Id.*) Second, the Fund policy's JLA does not operate unless Cincinnati's policy includes a reciprocal provision. (*Id.*) Third, the County's acceptance of the insurers' one-half payments, pursuant to the JLA, does not alter the County's rights of recovery in any way. (*Id.*)

---

[11]And, the County having been made whole by the insurers' one-half payments, there would be little conceivable purpose for the County to intervene.

Case 2:15-cv-00142-JPS   Document 75   Filed 06/05/17   Page 13 of 18

Trying to read the JLA to require or allow for Lexington's participation in arbitration is like trying to fit a square peg into a round hole. The JLA simply was not designed for that purpose. Rather, it was clearly designed for the singular purpose of governing disputes between the Fund and Cincinnati. But apparent purpose should not play a role in the Court's interpretation of the JLA; instead, the Court must interpret the JLA's plain terms. *See, e.g.*, *Betz*, 2014 WI 66, ¶ 39 (quoting *Huml*, 2006 WI 87, ¶ 52).

Interpreting the plain terms of the contract, it is clear that the JLA does not require or allow for Lexington's participation in the arbitration between the Fund and Cincinnati in this instance.

To begin, the preconditions to the JLA's application may not be present. First, it is not entirely clear that there has been "damage to or destruction of property, at a location designated in this policy and also designated in" the Cincinnati policy. (Docket #13, Ex. 1 at 24). Lexington argues that its policy effectively incorporates the JLA, so "this policy" might, by its plain terms, refer to the Lexington policy. That would be confusing, because the Lexington policy generally discusses covered property, as opposed to covered locations. (*See, e.g.*, Docket #13, Ex. 2 at 11, 20). It is, perhaps, more likely that "this policy" continues to refer to the Fund policy, even after being incorporated into the Lexington policy. *See Matthews v. Wisconsin Energy Corp.*, 534 F.3d 547, 554 (7th Cir. 2008) ("And terms incorporated by reference within the contract (but which the contract does not go on to define) do not create an ambiguity. Instead, as long as the extrinsic terms are clearly identifiable, the parties agree to abide by those terms just as they agree to the other terms in the contract.") (citing *Mack v. Joint School Dist., No. 3*, 92 Wis. 2d 476, 492, 285 N.W.2d 604 (Wis. 1979); *Barrons v. J.H. Findorff & Sons, Inc.*, 89 Wis. 2d 444, 452, 278 N.W.2d 827 (Wis.

1979)). In that case, the damage would have occurred "at a location designated in this policy," in satisfaction of the first precondition.[12]

However, even if both preconditions are satisfied, the plain terms of the JLA do not apply to Lexington. Under the JLA, the "insurers" submit to arbitration after the "insured"—the County—files a written request seeking payment of disputed amounts. Lexington is not an "insurer" of the County; rather, Lexington insures the Fund. (*See generally* Docket #13, Ex. 2 (listing Wisconsin Local Government Property Fund in "Issued to" portions of policy)). Lexington vehemently argues that it is an excess insurer as opposed to a reinsurer (Docket #24 at 5–7), and that may be true. But it does not change the fact that Lexington insures the Fund as opposed to the County. Accordingly, by its plain terms, the JLA does not call for or allow Lexington's participation in arbitration.[13]

Finally, even if the JLA *could* apply to Lexington, the circumstances make clear that it does not apply in this case. As the Court noted, two secondary conditions must follow the preconditions; those secondary conditions did not occur as to Lexington in this case. First, "[t]his company"

---

[12]It does not seem as though there can be any dispute that the "insurers"—whether that means the Fund and Cincinnati alone or together with Lexington—disagree over which policy covers the losses in question. The Court, therefore, assumes that the second precondition is satisfied.

[13]This is especially true in light of the fact that typical insurance business practice would involve only the Fund and Cincinnati as parties to the arbitration; an excess insurer is not typically included or contemplated by a JLA provision. *See* 5-51 Christine Davis, Lara Cassidy, David Mancini, *New Appleman on Insurance Law Library Edition* § 51.07 (2015) (not discussing participation of excess insurer in JLA-related arbitration); *Tufail*, 2013 WI 62, ¶ 28 (plain terms of contract to be interpreted in "'the manner that [the contract] would be understood by persons in the business to which the contract relates.'") (quoting *Columbia Propane*, 2003 WI 38, ¶ 12).

may refer to Lexington, by virtue of the incorporation of the JLA into the Lexington policy. If that is the case, then Lexington would be required to pay "one-half of the amount of the loss which is in disagreement." Lexington clearly has not done so. Second, the payment and arbitration provisions flow from the "written request of the insured." In this case, the insured—the County—sent its written request only to the Fund and Cincinnati, because those two insurers were the only funds disputing payment to the County.[14] Third, Lexington seems to want to arbitrate more than the $1.6 million currently at issue between the Fund and Cincinnati,[15] but this would be inconsistent with the terms of the JLA. The JLA limits the "amount of the loss which is in disagreement" to "the minimum amount remaining payable under the" Cincinnati policy or separate fire policy. Lexington appears to be seeking to arbitrate much more. Additionally, seeing as the Fund and Cincinnati have each paid $800,000 as one-half of the "amount of loss which is in disagreement," the "amount of loss which is in disagreement" is capped at $1.6 million by the JLA's plain terms. Fourth, it is only "the payments of the insurers hereunder and acceptance of the same by the insured" that "signify the agreement of the insurers to submit to and proceed with arbitration." Lexington has not made any payments under the agreement, so it has not submitted to arbitration. Fifth, arbitration must occur within 90 days of payments under the JLA. But, again, Lexington has not made any

---

[14]Further, although Lexington would disagree (it vehemently objects to being labeled a reinsurer), it appears that Lexington insures the Fund, as opposed to the County. (*See generally* Docket #13, Ex. 2 (listing Wisconsin Local Government Property Fund in "Issued to" portions of policy)).

[15]*See* Docket #24 at 2 ("all parties with a contract containing the arbitration provision can participate in the arbitration to determine the full amount of the disputed loss covered under Cincinnati's boiler and machinery insurance policy.")

payments under the JLA and so has not signified its agreement to proceed within 90 days. Sixth, the JLA gives only the Fund and Cincinnati the ability to choose arbitrators; it does not mention that Lexington has any power in this regard. In sum, Lexington's situation exists so far outside of the terms of the JLA, that the JLA cannot possibly be read to require or allow Lexington's participation in the arbitration.[16]

Thus, even appreciating the extremely liberal standards that apply to arbitration clauses, the Court cannot agree with Lexington's argument in this case. The Court cannot identify any "construction of the arbitration clause that would cover the grievance on its face," *Cirilli*, 2009 WI App 167, ¶ 14 (citing *Joint School Dist. No. 10*, 78 Wis. 2d at 111, 253 N.W.2d 536; *Kimberly*, 222 Wis.2d at 38, 586 N.W.2d 41), and, therefore, cannot construe the arbitration clause in Lexington's favor.

3.     CONCLUSION

For all of these reasons, the Court is obliged to deny Lexington's motion to compel arbitration. It is now time to start moving this case forward. And, consistent with that objective, the Court will simultaneously issue an order setting this case for a scheduling conference.

Accordingly,

_____

[16]The Court also notes that Lexington's proposed reading of the JLA would disregard many of these terms. For instance, among other things, Lexington does not address or account for the one-half payment requirement, the written notice requirement, or the definition of the amount of the loss. This contravenes a standard principle of contract law: the Court must be sure to give reasonable meaning to every part of the contract, so as not to ignore any portion. *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64 ¶ 45, 326 Wis. 2d 300, 786 N.W.2d 15 (citing *Kasten v. Doral Dental USA, LLC*, 2007 WI 76, ¶ 48, 301 Wis. 2d 598, 733 N.W.2d 300).

IT IS ORDERED that Lexington's motion to compel arbitration and
stay judicial proceedings (Docket #12) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 17th day of April, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge