# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

STATE OF WISCONSIN LOCAL
GOVERNMENT PROPERTY
INSURANCE FUND,

                         Plaintiff,

v.

LEXINGTON INSURANCE
COMPANY and THE CINCINNATI
INSURANCE COMPANY,

                         Defendants.

Case No. 15-CV-142-JPS

## ORDER

## 1.     INTRODUCTION

This lawsuit arises from a fire at the Milwaukee County courthouse (the "Courthouse") on July 6, 2013. The parties, various insurance companies, are litigating to determine which of them must ultimately foot the bill for the damage it caused. Plaintiff State of Wisconsin Local Government Property Insurance Fund (the "Fund") was the primary insurer and has already paid the insured, Milwaukee County (the "County"). The Fund contracted with Defendant Lexington Insurance Company ("Lexington") for additional insurance should a loss exceed what the Fund could pay. The County also obtained insurance directly from Defendant The Cincinnati Insurance Company ("Cincinnati") for supplemental coverage for the Courthouse. The Fund's Complaint asserts the following causes of action divided into three counts:

     1)      A request for declaratory judgment that Lexington and

               Cincinnati must reimburse the Fund, pursuant to their

respective insurance policies, for the amounts paid to the County;

2)      Breach of contract against Lexington for failing to pay the Fund's claim on its policy; and

3)      Bad faith against Lexington for its failure to pay the claim.

*See* (Docket #1-2 at 20-24).

On May 11, 2017, the Fund filed a motion for summary judgment against Lexington (but not Cincinnati) as to Counts One and Two. (Docket #82). After seeking leave to conduct additional discovery, Lexington filed its response without opposition from the Fund on September 8, 2017. (Docket #145). The Fund replied on September 22, 2017. (Docket #152). On June 15, 2017, Lexington filed its own motion for summary judgment as to Count Three. (Docket #102). The Fund responded on July 17, 2017. (Docket #126). Lexington replied on August 4, 2017. (Docket #138). Upon consideration of the parties' filings, the Court must grant summary judgment to the Fund and largely deny it to Lexington.

## 2.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).   A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d

356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). Internal inconsistencies in a witness's testimony "'create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all.'" *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). The non-movant "need not match the movant witness for witness, nor persuade the court that [its] case is convincing, [it] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## 3. RELEVANT FACTS

The following facts are material to the parties' motions. They are drawn from the parties' factual briefing unless otherwise noted. *See* (Docket #127, #139, #146, and #151). For brevity's sake, the Court will present all of the pertinent facts here and note any disputes thereof. The appropriate standard of review will be applied in the Court's separate analysis of each party's motion. *See infra* Parts 4.1 and 4.2.

### 3.1 The Insurance Policies

There are two policies which together form the basis of this lawsuit. The first is the policy purchased by the County from the Fund (the "Fund Policy"). The Fund Policy lists the Courthouse as covered property and the County as the insured. The Fund Policy opens with, *inter alia*, the following passage:

In consideration of the provisions of this policy, the payment of premium, receipt of a statement of values, property in the open schedule and/or contractors equipment detail, and in accordance with the provisions of Ch. 605, Wisconsin Statutes, the "Fund" insures those named on the Declarations page for the coverages indicated by amount of coverage and premium.

(Docket #85-1 at 157). The Fund Policy goes on to state that it affords coverage for "all sudden and accidental direct physical loss or damage except as limited or excluded in the following sections." *Id.* The Fund agreed to pay the replacement cost of any covered property, even when that would be greater than its stated value. *Id.*; *see id.* at 20 (Courthouse listing on the Statement of Values).

Like most insurance contracts, the Fund Policy contains a number of exclusions. (Docket #85-1 at 162-64). Section VI catalogs the exclusions in two subsections, A and B. Subsection A is prefaced with the statement that "[t]he 'Fund' will not pay for loss or damage caused directly or indirectly by . . . any of the following[.]" *Id.* at 162. Subsection A goes on to list various specific exclusions under this heading:

Wear and tear[;] . . . deterioration; rust or corrosion; . . . inherent vice, inherent or latent defect; contamination; . . . error, omission, or deficiency in design, specifications, workmanship or materials; . . . unless loss by a peril not excluded in this policy results, and then the "Fund" will be liable for only such resulting loss.

*Id.* Subsection B opens with the same language as Subsection A, but also includes the following sentence: "Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss or damage." *Id.* at 163. This is known as an "anti-

concurrent cause" provision. *See Am. Fam. Mut. Ins. Co. v. Schmitz*, 793 N.W.2d 111, 113-14 (Wis. Ct. App. 2010).

The second relevant policy is that between Lexington and the Fund (the "Lexington Policy"). Lexington issued its policy to the Fund in March 2013. It describes the covered perils as "all risks of direct physical loss or damage . . . except excluding equipment breakdown and as further described in the approved policy form." (Docket #76-1 at 5) (capitalization altered). The overall liability limit was $100 million and had a $1.8 million deductible. *Id* at 4-5. The Lexington Policy also has a section on "sublimits" on coverage, which states that "equipment breakdown" is not covered. *Id.* at 14-15. The term "equipment breakdown" is not defined in the Lexington Policy. Various other exclusions, including those for internet malfunctions, data corruption, terrorism, boilers and machinery, and mold are all present in the Lexington Policy, and each includes an anti-concurrent cause provision. The Lexington Policy expressly incorporates and follows the form of the Fund Policy, meaning that the same coverages and exclusions are present in both contracts. *Id.* at 3, 22-34. This is referred to in the industry as a "follow form" provision.

### 3.2 The Loss Event

On July 6, 2013, the Courthouse—an enormous eleven-story building and the hub of many County governmental offices beyond the judiciary—was damaged. The County made a claim on the Fund Policy the very next day. Brynn Bruijn-Hansen ("Bruijn-Hansen"), the manager of the Fund, toured the Courthouse soon after. She observed what appeared to be fire-related damage in the basement and smoke damage in the upper floors of the building. During her tour, Bruijn-Hansen saw smoke on the third floor and smelled it as high as the eighth.

The Fund concluded that coverage was available for the damage because it was due to a sudden and accidental direct physical loss, resulting at least arguably from a covered peril. This determination included potential coverage under the "resulting loss" language of the Subsection VI.A exclusions. The Fund determined that the level of coverage for this loss was replacement cost. The County provided a sworn statement of loss indicating the replacement cost for the damaged property was more than $19 million. Because the claim was arguably covered, Bruijn-Hansen followed the procedures dictated by the applicable statute (discussed further below) and certified the loss to the Wisconsin Department of Administration for payment. To date, the Fund has paid a total of more than $18 million to the County.

Lexington denies that the claim was even arguably covered because of an additional exclusion in Section VI.A, which excludes loss from "[e]lectrical or mechanical breakdown including rupture or bursting caused by centrifugal force." (Docket #85-1 at 163). Lexington further maintains that the Fund's investigation was cursory and that Bruijn-Hansen was not qualified to determine the cause of the loss. It questions how Bruijn-Hansen could have made a determination for coverage and amount without waiting for the opinions of the Fund's retained experts.

While approving the County's claim, the Fund simultaneously made a claim on the Lexington Policy. The Fund gave Lexington notice of its claim on July 8, 2013. In connection therewith, the Fund provided Lexington with a sworn proof of loss statement. Upon receipt of the claim, Lexington retained a number of consultants to commence its investigation. The investigation, described in greater detail below, resulted in a determination that Lexington would not cover the Fund's loss.

### 3.3 The Parties' Positions on Cause and Origin

Prior to addressing the specifics of the denial, it is helpful to know what the parties' positions are with respect to the underlying merits of the Fund's claim. Both the Fund and Lexington engaged numerous experts to evaluate the source of, and damage caused by, the events of July 6, 2013. The Fund's investigation placed blame on a fire, which then caused smoke damage throughout the Courthouse. According to the Fund's experts, an electrical capacitor in the basement failed and ruptured. The capacitor failed because its insulation degraded, having been in place for three years beyond its twenty-year expected lifespan. The combustible oil inside, Wemcol, ignited, generating heat and smoke. The fire, and the overvoltage resulting from the loss of the first capacitor, caused adjacent capacitors to also fail. This burned their Wemcol, as well as various other nearby combustibles like cable insulation. The fire also created electrical arcing between metal components of the capacitors. The fire theory is consistent with the observations of first responders to the event, who smelled smoke and saw it coming from air ducts. It is also supported by the Fund's expert testimony on smoke spread, which states that the observed smoke damage fits a Wemcol fire much more closely than an electrical arcing event. The smoke particulate generated by a Wemcol fire could have covered millions of square feet within the building.

Lexington agrees that the capacitor failed and ruptured, but its experts have differing opinions on the precise cause and resulting damage. They believe the capacitor rupture was caused by an electrical failure, which raised the internal pressure of the capacitor beyond what it could withstand. The resultant explosion caused mechanical damage to other electrical components nearby. This in turn created an electrical arc which

ignited plasma at approximately 5,000 degrees Fahrenheit. The arc propagated around the electrical components, melting and vaporizing some of them. This also released some particulate matter around the area. The electrical arcing event was sustained for approximately eighteen minutes. Lexington attributes the length of the event to a failure in the electrical failsafe systems within the Courthouse. Only when the electrical utility's protective measures activated did the arcing event end. Thus, Lexington's experts attributed the entire event to two electrical equipment failures, one in the capacitors, and the other in the failsafe mechanism. As to the resulting damage, Lexington's smoke dispersion expert says that very little smoke particulate would have traveled far from the Courthouse basement. Lexington also questions the smoke dispersion model generated by the Fund's expert as being inconsistent with the facts, such as the dimensions of the Courthouse and the sequence and location of triggered smoke detectors.

### 3.4 The Investigation

The Court now turns to a timeline of the investigation. Lexington initially attempted to inspect the Courthouse on July 17, 2013, but was denied entry by Dennis Dietscher ("Dietscher"), a County employee. Its experts were apparently able to perform some investigation (or obtain information from others) prior to August 2, 2013, because on that date, Lexington sent a reservation of rights letter to the Fund. The letter stated that Lexington's initial investigation sourced the damage to electrical arcing. (Docket #76-16 at 3). In Lexington's view, this was excluded under Section VI.A's provision for electrical or mechanical breakdown. *Id.* Lexington reserved its right to "invoke any policy term or condition . . . to

[the Fund's] submitted loss and claim, as may be brought to light while [Lexington's] investigation continues." *Id.* at 4.

On August 20, 2013, Lexington was invited to the Courthouse to observe the Fund's investigators at work. On October 1, 2013, Lexington notified the Fund that it could not consider the Fund's payment request (still pending as of July 8) until it was able to confirm the cause of the loss and then evaluate potentially applicable exclusions. A few days later, Lexington came to do an investigation with its own team. Dietscher was involved again and greatly limited Lexington's access to the building. Later in October, the Fund and Lexington worked together to conduct some "sampling/testing of PPE levels for the artifact inspection." (Docket #127 at 25). The sampling and testing was completed in November 2013. A further inspection was conducted in December 2013, but Lexington did not participate.

On January 24, 2014, apparently after discussing the claim with Bruijn-Hansen, Lexington paid $5 million to the Fund "associated to the loss and damage" to the Courthouse. (Docket #76-17 at 2). Lexington's payment was "made in good faith without specific designation as to a warranty of indemnification under the policy." *Id.* The parties agree that this was not an unqualified admission of coverage, though Lexington says it was an unconditional payment. The Fund denies receiving any representation, prior to this lawsuit, that the payment was unconditional. Further, as of the date of the payment, Lexington had not informed the Fund whether it would cover the Courthouse damage.

Between February 4 and 11, 2014, Lexington and the Fund finally completed their site inspections. The electrical equipment at issue was disassembled and moved off-site. The parties' representatives inspected the

equipment in early June 2014, though the Fund claims that Lexington could have performed the inspection much sooner, as early as March. Throughout June 2014, Lexington asked the Fund for an analysis of "wipe samples," which was not provided. The Fund maintains that it did not yet have the results of the wipe sample testing, and that it had no duty to pass the results on to Lexington in any event. Lexington claims that its consultants continued their laboratory work from late June through early October, 2014.[1]

Throughout this time, from July 2013 through November 2014, the Fund repeatedly insisted that Lexington make a final coverage determination and pay its claim. On November 13, 2014, the Fund filed a complaint with the Wisconsin Commissioner of Insurance ("OCI") about Lexington's slow progress in reaching a coverage determination. After receiving submissions from both sides, the OCI issued a letter-report on January 7, 2015. The OCI found that Lexington's investigation was not "concluded with reasonable dispatch" in accordance with applicable Wisconsin administrative code rules on insurance settlements. *See* (Docket #128-1 at 25-28); *see* Wis. Adm. Code § Ins. 6.11(3) (it is unfair for insurance companies to fail "to initiate and conclude a claims investigation with all reasonable dispatch").

Specifically, the OCI concluded that the nearly year-and-a-half investigation period was "prima facie evidence" of the lack of "reasonable

---

[1]Lexington's statement of fact on this point cites no evidence at all. (Docket #127 ¶ 55). In the context of Lexington's other proposed facts, the Court believes the citation should be to their November 13, 2016 investigative report. (Docket #54-4 at 12-15). The Court does not hold this procedural failing against Lexington as it is not dispositive.

dispatch." (Docket #128-1 at 26). It further noted various delays occasioned by Lexington. These included postponing a site assessment, failing to conduct its own offsite testing in a timely manner, and blaming testing delays on the Fund when Lexington alone was responsible. *Id.* at 26-27.[2] The OCI placed specific emphasis on Lexington's February 5, 2014 site assessment, wherein its position that the "electrical arcing event" caused the loss was crystallized. *Id.* at 27. Because "electrical arcing" was Lexington's refrain throughout its investigation and was indeed the eventual basis for denying coverage, the OCI determined that Lexington was equipped to make a coverage determination at the conclusion of the February 5, 2014 site assessment. *Id.* Lexington maintains that November 2014 was the soonest it was adequately prepared to issue a coverage decision. Until it received and evaluated the investigative report prepared by Lexington's team of experts (the "Report"), Lexington states that it could not determine whether its coverage obligations exceeded either the $1.8 million deductible or the $5 million advance payment.

### 3.5    Coverage Denial

On November 24, 2014, Lexington formally denied coverage. The denial was, in large measure, predicated on the Report. Lexington's denial letter summarized the reasons for that result as explained in the Report. It pointed to the arcing event as the main source of damage in the electrical bay. The event was caused by the two electrical or mechanical failures described above. The arc spread particulate matter through the building.

---

[2]In particular, in its submissions to the OCI, Lexington claimed that it needed certain surface samples in the Fund's possession for testing prior to making a coverage determination. (Docket #128-1 at 26-27). Lexington nevertheless issued its November 24, 2014 denial letter without actually completing the surface sample testing. *Id.* at 27.

Lexington admitted that a "discrete" fire occurred after the arcing event was over, but the flames did not spread beyond the electrical bay where the faulty capacitors had ruptured. Beyond the denial letter summary, the Report further stated that openings in the Courthouse's structure could allow heat and smoke to move upward through the building. It also noted that 37 of the Courthouse's 97 smoke detectors were triggered at the time of the incident. However, the Report did not address whether any smoke, whether from electrical arcing, burning Wemcol oil, or anything else, migrated to the upper floors and caused damage. Lexington counters that Dietscher denied their investigators access to those floors, so its experts could not opine on what had happened there.

Lexington claimed that these events fell within two exclusions of the Lexington Policy. The first is located in one of the endorsements to the Lexington Policy, which states that there is no coverage for "equipment breakdown"; this is the "sublimits" section identified above. (Docket #52-2 at 6). The second comes from the Fund Policy, which again, the Lexington Policy incorporated in its entirety. The Fund Policy provides that damage caused by "electrical or mechanical breakdown" is excluded. *Id.* at 7. Lexington thus denied any liability which exceeded the $1.8 million deductible.

As of today's date, the Fund asserts that Lexington has not indemnified it pursuant to the Lexington Policy or affirmed its coverage obligations. Lexington maintains that based on the Report's findings, the Fund did not sustain a covered loss exceeding its deductible or the amount of Lexington's prepayment (discussed further below), and so it has satisfied any coverage liability. The Fund claims it is still owed approximately $12.5 million, which Lexington denies.

4.      **ANALYSIS**

The Court begins with the Fund's motion, then turns to Lexington's.

**4.1      The Fund's Summary Judgment Motion**

As noted above, the Fund moves for summary judgment on Count One, seeking declaratory judgment, and Count Two, alleging breach of contract. (Docket #82). As to Count One, the Fund asks the Court to declare its rights under the Lexington Policy, namely that Lexington must reimburse the Fund for all amounts paid to the County. *Id.* If this is true, Lexington has breached its agreement with the Fund and judgment is appropriate in the Fund's favor on Count Two as well.

The Fund offers two independent arguments in support of its motion, but the Court need only consider the first. The Fund contends that Lexington incorporated by reference certain provisions of the Fund Policy which mandate reimbursement. As noted above, the Lexington Policy expressly incorporates the Fund Policy. The Fund Policy states that it will provide coverage to the County "in accordance with the provisions of Ch. 605, Wisconsin Statutes[.]" (Docket #85-1 at 157).

Chapter 605 of the Wisconsin Statutes includes a number of subsections. Wis. Stat. §§ 605.01-605.35. Relevant to the Fund's motion is Section 605.23(1), which states that

> The [Fund] manager shall determine within a reasonable time any loss on insured property owned by a local governmental unit or for which the unit is liable and promptly certify the amount to the department of administration.

*Id.* § 605.23(1). In the Fund's view,

> the Fund manager is legislatively empowered and has the sole authority to determine the loss and to facilitate payment

on it. By incorporating this language into its own policy, *Lexington has contractually agreed that the Fund has the authority to determine the loss on any claim that is the subject of a claim under Lexington's policy arising out of a loss by a Fund insured.*

(Docket #83 at 14) (emphasis in original).

The facts underlying the Fund's Section 605.23(1) argument are not subject to genuine dispute. The majority arise from the Lexington Policy, the Fund Policy, and Wisconsin law. The only necessary fact which arises outside these sources is Bruijn-Hansen's certification of coverage and the amount of the loss. Lexington's attempts to dispute the merits of that certification, namely whether coverage should have been afforded, and what the amount of the loss should be, are misplaced. The only relevant consideration is the fact that the certification happened, not its underlying virtues.[3]

On the undisputed facts presented, the Court would agree with the Fund's reasoning. Section 605.23(1) places sole discretion in the hands of the Fund manager, Bruijn-Hansen, to make a certification of coverage and the amount of loss. In reality, the only entity which would dispute Bruijn-Hansen's determination is the County, and only then if the Fund had not afforded any coverage or only covered a lesser amount than what was sought. Lexington, either intentionally or through inartful drafting of its policy, agreed to be bound by Bruijn-Hansen's certification to the same extent as the Fund. Regardless of the fire's true origin and how much

---

[3]In the Court's view, Lexington's request for additional discovery was therefore meritless, at least with respect to the Section 605.23(1) argument. The Fund did not object to Lexington filing a responsive brief, however, and so the Court had no reason to fault Lexington for this. *See* (Docket #144); Text Only Order of September 5, 2017.

damage it caused, pursuant to the Lexington Policy, Lexington is required to abide by the Fund's certification and reimburse it for the amounts paid to the County.[4]

Lexington's arguments to the contrary are unavailing. First, Lexington contends that Section 605.23(1) speaks only to the Fund's obligations to a governmental entity, and is "silent on the obligations of other insurers . . . to accept the determinations made by the Fund in adjusting claims under its policies." (Docket #145 at 8). This is both true and irrelevant. Lexington incorporated the Fund Policy and, whether wise or not, agreed to be bound to its contours to the same extent as the Fund. Further, Lexington says that the next part of the statute, Section 605.24, "governs the Fund's recovery against third parties, such as other insurers or reinsurers." (Docket #145 at 9). However, that section is primarily directed at recovery from those who *caused* the damage, not other insurers. *See* Wis. Stat. § 605.24(1), (3). The only portion dealing with other insurers is directed solely at collecting funds from reinsurers, a status Lexington vociferously denies. *Id.* § 605.24(2); *supra* note 4.

Second, Lexington claims that Section 605.23(1) cannot be part of the Lexington Policy via the follow form provision, because Wisconsin law prohibits such incorporation by reference. *See* Wis. Stat. § 631.13 (Chapter 631 addresses "Insurance Contracts Generally," and Section 631.13

---

[4]The second argument is that the Lexington Policy is reinsurance, and as such, Lexington must "follow the fortunes" of its insured, the Fund. (Docket #83 at 15-27). Here, this means that Lexington must provide coverage to the Fund to the same extent the Fund provided coverage to the County. Lexington denies both that the agreement is for reinsurance, and that even if it were, that the "follow the fortunes" doctrine would apply. (Docket #145 at 11-28). This issue comprises the vast majority of the parties' briefing on the Fund's summary judgment motion. In light of the Court's disposition, it is moot.

provides that "no insurance contract may . . . incorporate any provision not fully set forth in the policy"). Lexington, however, chose to follow the form of the Fund Policy which expressly incorporated Chapter 605 by reference. Lexington raised no concerns about the incorporation provision until now. The Court will not hear its tardy objection on these grounds at such a late hour. In other words, Lexington cannot seek shelter in the parts of the Fund Policy it likes—the electrical and mechanical breakdown exclusion—while avoiding the effect of other provisions—the invocation of Chapter 605.

Third, Lexington argues that the Fund Policy's mention of Chapter 605 is a "passing reference" which fails to incorporate the various specific provisions of that chapter.[5] The Court does not agree. The reference to Chapter 605 is not buried deep in a specific or intricate provision of the Fund Policy. Rather, it appears at the very beginning of the document, in the third of three short prefatory paragraphs. (Docket #85-1 at 157). Lexington cannot be surprised by the operation of Chapter 605's relevant provisions when this is expressly stated at the outset of the policy. Additionally, adopting Lexington's view would render the Chapter 605 reference superfluous, something to be avoided when construing contracts. *Md. Arms Ltd. P'ship v. Connell*, 786 N.W.2d 15, 25 (Wis. 2010) ("When

---

[5]Lexington's primary support on this point comes from an unreported circuit court order from Dane County, Wisconsin. *See* (Docket #145 at 10). Lexington says that the Dane County court refused to read the provision of Chapter 605 into an agreement based on a similarly brief reference. *Id*. Of course, the orders of a state trial court are non-precedential. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). Even if the order had some persuasive value, it has not been communicated to the Court; the order was not attached to Lexington's briefing and is not otherwise available to the Court for its review. *See* Civil L.R. 7(j)(2) (unreported opinions cited in briefs must be filed as attachments to those briefs). In light of this failing, the Court must accord no persuasive weight to the order.

possible, contract language should be construed to give meaning to every word, avoiding constructions which render portions of a contract meaningless, inexplicable or mere surplusage.") (quotation omitted).[6]

Finally, Lexington maintains that a wholesale inclusion of Chapter 605 into the Fund Policy contradicts certain provisions of that policy and renders others meaningless. However, Lexington cites only two potentially problematic statutory provisions, and they have nothing to do with the subject of the Fund's motion. *See* Wis. Stat. § 605.23(2) (providing for an appraisal process to resolve disputes between the Fund and its insured about the value of a loss); *id.* § 605.03(3) (Section 605.03 describes the coverages the Fund must and may provide, and subpart (3) says that the Fund manager can establish a rule that "small losses in any one occurrence shall not be paid"). The Wisconsin Supreme Court instructs that

> [f]erreting through a policy to dig up ambiguity should not be judicially rewarded because this sort of ambiguity is insufficient. Rather, inconsistencies in the context of a policy must be material to the issue in dispute and be of such a nature that a reasonable insured would find an alternative meaning.

---

[6]The parties also raise another contract interpretation issue: ambiguity. Lexington weakly implies that the Chapter 605 reference might be ambiguous, and if so, it should be construed against the Fund, as the drafter of the Fund Policy. (Docket #145 at 10 n.2). The Fund counters that it is the insured as between the two, and that Lexington agreed to follow the form of the Fund Policy, so any ambiguities should be construed against Lexington. (Docket #152 at 4). The Court need not enter this fray. The Court does not find that the language is ambiguous, and Lexington's gesture at an ambiguity argument does not convince it otherwise. *See Hirschhorn v, Auto-Owners Ins. Co.*, 809 N.W.2d 529, 535 (Wis. 2012) ("[T]he mere fact that a word has more than one dictionary definition, or that the parties disagree as to its meaning, does not render the word ambiguous if only one meaning comports with an insured's objectively reasonable understanding.").

*Folkmann v. Quamme*, 665 N.W.2d 857, 869 (Wis. 2003). Section 605.23(1), and its application to whether Lexington must provide coverage to the extent sought by the Fund, is the only issue before the Court.

In the end, the Court's ruling is based on logic as applied to the limited set of relevant facts. Lexington complains that the Fund has not cited any cases interpreting Section 605.23(1) in the manner it suggests here. (Docket #145 at 8-9). The Fund's argument is not reliant on precedent, however, and Lexington itself failed to marshal any court opinions to support its reading of the policies and the statute. In the absence of controlling authority, the Court finds the Fund's position more persuasive. The Court, therefore, grants summary judgment to the Fund on Counts One and Two. As will be set forth in more detail in the final judgment in this matter, the Fund is entitled to a declaration that Lexington is obligated to pay its claim related to the July 6, 2013 fire. Similarly, Lexington has breached the agreement embodied in the Lexington Policy by failing to pay that claim.

### 4.2    Lexington's Summary Judgment Motion

Lexington seeks judgment with respect to the Fund's bad faith claim found in Count Three. The bad faith claim has evolved over the course of this litigation. The Complaint contains a lengthy list of conduct comprising a constellation of bad faith activity. (Docket #1-2 at 22-23). Most of the bad faith allegations are directed at the delay in Lexington's investigation and the unreasonable result it ultimately reached. *Id.*

Two specific acts the Fund cites are Lexington's imposition of the $1.8 million deductible and, as at least implied by the allegations, Lexington's interpretation of its policy as excess insurance rather than reinsurance. *Id.* In its response to Lexington's motion, the Fund states that

it no longer rests its bad faith claim on the deductible or policy interpretation grounds. (Docket #126 at 2 n.3).[7] Thus, only the other (but still numerous) allegations of bad faith remain at issue.

In Wisconsin, "every insurance contract has an implied duty of good faith and fair dealing between the insurer and insured." *Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 798 N.W.2d 467, 475 (Wis. 2011).[8] An insurer's acts of bad faith, for instance in denying a claim, are "a separate intentional wrong" from an insurer's breach of the insurance contract because they "result[] from a breach of duty imposed as a consequence of the relationship established by contract." *Anderson v. Cont'l Ins. Co.*, 271 N.W.2d 368, 374 (Wis. 1978). To prove a bad faith claim, a plaintiff must show "(1) 'the absence of a reasonable basis for denying benefits of the policy,' and (2) 'the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.'" *Blue v. Hartford Life & Accident Ins. Co.*, 698 F.3d 587, 595 (7th Cir. 2012) (quoting *Anderson*, 271 N.W.2d at 376).

The first element of a bad faith claim is assessed objectively. *Advance Cable Co., LLC v. Cincinnati Ins. Co.*, 788 F.3d 743, 748 (7th Cir. 2015). The

---

[7]Lexington requests that summary judgment be granted as to those two elements of the bad faith claim. (Docket #138 at 3). The better practice is to treat them as withdrawn, so that they will form no part of the bad faith claim at trial. In addition to seeking summary judgment on the bad faith claim, Lexington also requests that the Court order the Policy reformed such that the existence and proper application of the $1.8 million deductible is no longer subject to debate. (Docket #102 at 1; Docket #103 at 3-7). The Fund does not oppose this request. (Docket #126 at 1). Because this issue is the subject of Lexington's own counterclaim, a ruling on summary judgment is appropriate. *See* (Docket #76 at 39-43). The Court will therefore grant this aspect of Lexington's motion.

[8]This is an action premised upon the Court's diversity jurisdiction, and thus Wisconsin law must be applied to the Fund's claims. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 80 (1938).

Court considers whether "a reasonable insurer under the circumstances [would] have denied or delayed payment of the claim under the facts and circumstances." *Anderson*, 271 N.W.2d at 377. Stated another way, if an insured's claim is "fairly debatable" either in fact or law, then there existed a reasonable basis for denying the claim, and an insurer cannot have denied the claim in bad faith. *Id.* at 376. The right to "fairly debate" a claim exists even if the insurer ultimately loses on its argument that the claim should have been denied, as has occurred here. *See Mills v. Regent Ins. Co.*, 449 N.W.2d 294, 298 (Wis. Ct. App. 1989). In analyzing this issue, the Court also considers "'whether the insurer properly investigated the claim and whether the results of the investigation were subject to a reasonable evaluation and review.'" *Advance Cable Co.*, 788 F.3d at 748 (quoting *Brown v. Labor & Indus. Review Comm'n*, 671 N.W.2d 279, 287-88 (Wis. 2003)); *see also* Wis. Pattern Jury Inst. § 2761, Bad Faith By Insurance Company: Assured's Claim.

Lexington's argument is directed solely at the first element. Lexington maintains that it conducted a thorough investigation of the July 6, 2013 events and relied on competent experts in denying the Fund's claim to the extent it exceeded $6.8 million. Thus, no reasonable jury could find that it lacked a reasonable basis to deny further coverage. This may be proven true at trial, but for two reasons, the issue is not presently suitable for judgment as a matter of law.

First, Lexington's focus on the $6.8 million figure is misguided. As stated in its reply,

> Lexington asserts that it is reasonably debatable that the Fund did not sustain covered damage in excess of the $1.8 million deductible or the $5 million payment made by Lexington. Contrary to the Fund's assertion, Lexington did not take the

position that the Policy bars all damage to the Courthouse. Thus, to defeat Lexington's motion for summary judgment, the Fund needed to establish that it was not reasonably debatable that the Fund did not sustain covered damage exceeding $6.8 million, which it failed to do.

(Docket #138 at 2).[9] To the contrary, it is Lexington which is at fault for not establishing the facts necessary to support summary judgment on this ground. Lexington has not equipped the Court with any basis to establish the relevance of the $6.8 million figure. Namely, Lexington does not offer a statement of fact as to what *Lexington or its experts* established as the value of the Fund's loss, probably because it knew the Fund would dispute such an assertion (and thereby preclude summary judgment). The only concrete figures for the loss come from the Fund itself—approximately $20 million in total claimed by the County, (Docket #139 at 7), and about $12.5 million still owed to the Fund by Lexington, *id.* at 16. The Court does not know if the proper value for the loss, in Lexington's view, is $1.00, $1 million, $6.799 million, or anything else. Without knowing the value of the damage that Lexington believes was sustained, the $6.8 million figure exists in the air. The Court has no way to determine whether Lexington was even arguably

---

[9]Lexington's November 24, 2014 denial letter is inconsistent with the quoted language. The letter states that based on Lexington's investigation, "there is no coverage under the referenced excess property insurance contract." (Docket #52-2). Later, the letter references the deductible, noting that "no facts have been presented which would suggest any fire damage in excess of the $1.8 million deductible. Accordingly, Lexington denies any and all liability[.]" *Id.* The $5 million advance payment is never mentioned. *See generally id.* These statements (and omissions) do not match Lexington's current position regarding the $6.8 million figure. To the extent Lexington might be penalized for this discrepancy, the Court will not do so, because it does not change the result.

right to deny coverage *because* the value of the loss was less than $6.8 million.

Second, Lexington has not shown that it would be entirely unreasonable for a jury to agree with the Fund's bad faith claim. On summary judgment, bad faith claims present an interesting confluence of burdens. It is clear that the burden to establish an insurer's bad faith is heavy; the insurer's decision to deny coverage must be beyond any "fair" debate. *Anderson*, 271 N.W.2d at 376. However, it is Lexington, not the Fund, who seeks summary judgment on the bad faith claim. The Fund is under no obligation to prove its claim at this stage. Rather, the Fund must merely present, with all of the evidence and inferences therefrom construed in its favor, a set of facts upon which a reasonable jury could find bad faith.

The Fund has done so. Its allegations of bad faith rest on three primary grounds. First, the Fund takes issue with Lexington's investigation. The Fund contends that Lexington both failed to conduct a proper investigation and did not subject its investigation to appropriate review. *Advance Cable Co.*, 788 F.3d at 748. The Report is deficient because it merely states that the capacitors failed, without explaining why. The Report also makes only a limited mention of the smoke damage from the burning Wemcol oil. As the Fund points out, "[a] jury could conclude that this was by design—i.e., that Lexington had decided at the outset that it would deny coverage based on the equipment breakdown and the electrical or mechanical breakdown exclusions, and that the investigation would be tailored to produce only those results that supported the theory." (Docket

#126 at 8).[10] The Fund's expert concludes that an appropriate investigation and review thereof would show that the capacitor failure, while itself an excluded peril, resulted in non-excludable damage via the Wemcol fire and smoke. In other words, the Fund's theory is that the Report's obvious gaps in reasoning meant that Lexington could not reasonably rely on it without subjecting the Report to additional review. *Tripalin v. Am. Fam. Mut. Ins. Co.*, 880 N.W.2d 183, 2016 WL 1370129, at *3 (Wis. Ct. App. Apr. 7, 2016) ("[T]o establish a bad faith denial of coverage, [the plaintiff] would need to show that the opposing expert was so obviously wrong in his opinion that [the insurer] could not have reasonably relied on his opinion in its decision to deny coverage.").

Lexington counters that the Fund has not pointed to what other investigations it should have done to arrive at a more reasonable conclusion. Lexington also cites Dietscher's conduct as inhibiting its investigative efforts. These and any other mitigating factors may be presented to the jury. Though the issue of bad faith is a close one on the record presented, the facts do not warrant judgment as a matter of law on the claim. In other words, Lexington is correct that courts, including this one, have found summary judgment appropriate on bad faith claims. *Advance Cable*, 788 F.3d at 748-49; *Baires v. State Farm Mut. Auto Ins. Co.*, 231 F. Supp. 3d 299, 313 (E.D. Wis. 2017). Unlike *Baires*, however, where the insured offered a scattershot kaleidoscope of unrelated evidence to support a finding of bad faith, the Fund advances specific and supported allegations

---

[10]As mentioned above, the Report also finds that the fire started after the arcing event. The Fund's expert concludes that the fire *preceded* the arcing event. (Docket #126 at 16). A jury could conclude that Lexington intentionally flipped the sequence of events to ensure that coverage would be excluded.

of fault in various aspects of the investigation. The jury will determine whether this amounts to bad faith.

Second, the Fund argues that Lexington's interpretation of the insurance policies is so unreasonable as to constitute bad faith. Wisconsin interprets policy exclusions "narrowly or strictly . . . against the insurer if their effect is uncertain," *Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004), and finds them ambiguous when they "are so imprecise and elastic as to lack any certain interpretation or are susceptible to more than one reasonable construction," *Romero v. W. Bend Mut. Ins. Co.*, 885 N.W.2d 591, 600 (Wis. Ct. App. 2016) (quotation omitted). In the Fund's view, the "equipment breakdown" exclusion in the Lexington Policy is just this type. The Fund believes it is "hopelessly ambiguous," (Docket #126 at 11), inasmuch as it does not define "equipment," "breakdown," or the two together, and fails to explain how the "equipment breakdown" exclusion might actually apply to the real world. The exclusion also lacks an anti-concurrent cause provision. These uncertainties mean that a jury could find the Fund's interpretation of the exclusion—that it is limited to direct damage to the "equipment" that "br[oke] down"—is at least as reasonable as Lexington's view—that all of the damage resulting from the capacitor failure is excludable. If the jury so finds, they could further conclude that Lexington's interpretation was so irrational as to reflect its bad faith.

The Fund also takes issue with Lexington's application of the electrical and mechanical equipment breakdown exclusion in the Fund Policy. The Fund contends that it is unreasonable for Lexington to apply the exclusion when Bruijn-Hansen did not, in accordance with her authority under Section 605.23(1). Further, the same statute requires the Fund to "provide protection against fire" and offer coverage "at least as favorable

as that customarily provided" by private insurers. Wis. Stat. § 605.03(1)(a). This mandate bears on the Fund Policy, namely that it should be interpreted to afford coverage for the fire. The Fund Policy exclusion also lacks an anti-concurrent cause provision. Recall that without such a clause, "where there are multiple causes for a loss, some of which are insured and others of which are excluded, the insured risk prevails over the excluded risk." *Schmitz*, 793 N.W.2d at 118. Fire and smoke are covered perils, and so the damage they caused would be covered even if they originated from an electrical or mechanical breakdown.[11]

Lexington asserts that a bad faith claim cannot be premised simply on an erroneous interpretation of a policy provision. *Advance Cable*, 788 F.3d at 748; *Mills*, 449 N.W.2d at 298. While true, the Fund has offered evidence that Lexington's interpretation was so flawed that a jury could find recklessness, if not intent, in misconstruing the exclusions. Lexington also takes issue with the Section 605.23(1) argument, contending that the statute's application is fairly debatable. In light of the Court's ruling on the Fund's summary judgment motion, this is untrue. Even as of the time of the coverage decision, Lexington wrote its policy and subjected itself to Section

---

[11]The Fund relies on *Arnold* to support this "resulting loss" analysis. *Arnold v. Cincinnati Ins. Co.*, 688 N.W.2d 708 (Wis. Ct. App. 2004). A resulting or ensuing loss exception to a particular exclusion "tells an insured that losses indirectly resulting from the [excluded] causes are covered if they are not excepted or excluded elsewhere in the policy." *Id.* at 716. The Court applies that holding here without further analysis for two reasons. First, Lexington made no attempt to distinguish *Arnold*. Second, Lexington maintains "any discussion regarding the damage on upper floors caused by the July 6, 2013 Incident is not relevant to determining the cause [of the incident]." (Docket #138 at 7). This is the Fund's point, though—fire and smoke are covered perils which arose indirectly from the electrical and mechanical breakdown, so Lexington had no basis to conclude that the damage they caused was not covered.

605.23(1) by following the Fund Policy's form. The Fund can pose to the jury the question of whether application of the statute or the various exclusions is beyond fair debate.[12]

Finally, the Fund alleges that Lexington intentionally delayed its investigation, thereby avoiding the need to finally determine coverage and pay. As described in the OCI report, Lexington could have made a coverage determination long before November 2014. This too supports a jury finding of bad faith. Lexington responds that the Fund's expert on the cause of the fire testified that it took her until February 2015 to reach a conclusion. This fact and others certainly support Lexington's view, but they are countered by the OCI report and the facts underlying it. Lexington also cites *Baires* for the proposition that "an insured's complaint of an untimely investigation does not establish bad faith." (Docket #138 at 13). This is inaccurate. *Baires* acknowledged that a delay can support a bad faith claim, but the insured's specific conduct in that case did not. *Baires*, 231 F. Supp. 3d at 309-10 (citing *Danner v. Auto-Owners Ins.*, 629 N.W.2d 159, 173-176 (Wis. 2001)).[13]

---

[12]In responding to the policy exclusion argument, Lexington again attempts to flip the burdens which are at play. Lexington does not dispute that the policy exclusions it relied upon to deny coverage are less than clear. (Docket #138 at 8) ("The Fund also argues that the equipment breakdown exclusion must be construed narrowly against Lexington and in favor of coverage. Based upon the evidence, it is clear that there is a fact question for the jury as to whether the exclusion applies to the loss."). It goes on to assert, however, that "[t]he Fund has not established that it was not fairly debatable that the equipment and electrical or mechanical breakdown exclusions barred the loss[.]" *Id.* The Fund need not establish anything at this juncture. The Fund has raised a jury question as to whether Lexington applied the exclusions in bad faith.

[13]The Fund claims that Lexington changed positions during its investigation, further demonstrating its bad faith. The Fund cites Lexington's October 1, 2013 letter, which stated that it could not consider payment until coverage was determined, and Lexington's $5 million payment in January 2014, which came long before the final coverage determination. The Fund's only citation

While Lexington attempts to pick apart various aspects of the Fund's bad faith evidence, that evidence viewed holistically raises disputes of fact which require a jury's intervention. Again, the question is a close one and the bar set for bad faith claims is quite high. Nevertheless, viewing all of the evidence in the Fund's favor, a reasonable jury could agree that Lexington's investigation and denial of the claim were done in bad faith. Lexington is therefore not entitled to summary judgment on Count Three.[14]

**5.      CONCLUSION**

The Fund's summary judgment motion must be granted upon the application of Section 605.23(1) to the narrow set of relevant facts presented. Lexington's motion must be denied because the Fund's response raised disputes of fact that must be left to the jury to resolve.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for summary judgment (Docket #82) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Lexington Insurance Company's motion for summary judgment (Docket #102) be and the same is hereby **GRANTED** on the unopposed ground that the 2013-14 insurance

---

in support, *Poling*, dealt with substantive issues of coverage, not payment. *Poling v. Wis. Physician Serv.*, 357 N.W.2d 293, 296-98 (Wis. Ct. App. 1984) (insurer greatly modified the basis for its coverage denial right before trial, supporting a jury finding that its investigation into the claim was woefully deficient, evincing bad faith). The Court will not extend *Poling* to apply to Lexington's partial payment in this case, not least because the Fund's argument thereon is underdeveloped. (Docket #126 at 20) (one paragraph of the Fund's brief mentions *Poling*); *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001) (insufficiently developed arguments are waived).

[14]On September 18, 2017, the Fund sought leave to file a sur-response to Lexington's motion, along with additional statements of fact. (Docket #148). That request is moot and will be denied as such.

policy issued by Defendant Lexington Insurance Company to Plaintiff should be reformed to contain a $1.8 million deductible, and is **DENIED** in all other respects; and

IT IS FURTHER ORDERED that Plaintiff's motion for leave to file a sur-response and supporting papers (Docket #148) be and the same is hereby **DENIED as moot**.

Dated at Milwaukee, Wisconsin, this 31st day of October, 2017.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge